# United States Court of Appeals for the Federal Circuit

---

**FORD MOTOR COMPANY,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

---

2018-1018

---

Appeal from the United States Court of International Trade in No. 1:13-cv-00291-MAB, Judge Mark A. Barnett.

---

Decided: June 7, 2019

---

PETER D. KEISLER, Sidley Austin LLP, Washington, DC, argued for plaintiff-appellee. Also represented by RICHARD M. BELANGER, BARBARA GUY BROUSSARD, DANIEL J. FEITH, ERIKA MALEY, GORDON D. TODD.

MICHAEL SHIH, Appellate Staff, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellant. Also represented by JEANNE DAVIDSON, MATTHEW JAMES GLOVER, JOSEPH H. HUNT; BEVERLY A. FARRELL, JASON M. KENNER, AMY RUBIN, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice, New York, NY; YELENA SLEPAK, Office of the Assistant

Chief Counsel, United States Bureau of Customs and Border Protection, United States Department of Homeland Security, New York, NY.

————————————

Before DYK, WALLACH, and HUGHES, *Circuit Judges*.

WALLACH, *Circuit Judge*.

Appellee Ford Motor Company ("Ford") sued Appellant United States ("the Government") in the U.S. Court of International Trade ("CIT"), challenging U.S. Customs and Border Protection's ("Customs") classification of its model year ("MY") 2012 Transit Connect 6/7[1] vehicles under Harmonized Tariff Schedule of the United States ("HTSUS")[2] Subheading 8704.31.00, which bears a duty rate of 25% *ad valorem*. Ford and the Government filed cross-motions for summary judgment, with Ford contending that its subject merchandise is properly classified under HTSUS Subheading 8703.23.00, which bears a lower duty rate of 2.5% *ad valorem*. The CIT denied the Government's Cross-Motion and granted Ford's Cross-Motion, thereby holding that Ford's proposed classification under HTSUS Subheading 8703.23.00 is correct. *Ford Motor Co. v. United States*, 254 F. Supp. 3d 1297, 1333 (Ct. Int'l Trade 2017); *see* J.A. 75–76 (Judgment).

The Government appeals. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5) (2012). We reverse.

————————————

[1]    Transit Connect 6/7 refers to certain vehicles made by Ford from the Transit Connect model line with vehicle identification numbers ("VIN") containing "either a [number] 6 or 7 in the sixth digit." J.A. 5540.

[2]    "All citations to the HTSUS refer to the 20[11] version, as determined by the date of importation of the merchandise." *LeMans Corp. v. United States*, 660 F.3d 1311, 1314 n.2 (Fed. Cir. 2011).

BACKGROUND

I. The Subject Merchandise

This appeal involves a single entry of subject merchandise, "which entered at the Port of Baltimore on December 26, 2011." *Ford*, 254 F. Supp. 3d at 1303 (citation omitted).[3] Ford originally began importing its line of Transit Connect 6/7s into the United States in 2009. *Id.* at 1302. Ford also produces a similar vehicle called the Transit Connect 9. *See id.* at 1304 n.13.[4] Ford based the design of both types of Transit Connect vehicles on its then-existing European V227 line of vehicles and imported the Transit Connects from its factory in Turkey. *See id.* at 1305. Specifically, "Ford's European V227 line included" (1) "the double-cab-in-van (DCIV)" and (2) "the Cargo Van." *Id.* (internal quotation marks and citations omitted). "Ford based the subject merchandise on its European V227 DCIV, not its Cargo Van." *Id.* (citations omitted).

Before importation into the United States, Ford avers that it "modified the European V227 DCIV to comply with all relevant U.S. safety standards," including the Federal Motor Vehicle Safety Standards ("FMVSS"). *Id.* (citations omitted). For instance, Ford redesigned the second row of seats' underbody support structure; added side-impact beams and foam blocks for protection; and changed the vehicle's lighting, labels, and turn signals. *Id.* at 1306. Moreover, "Ford designed the Transit Connect on the Ford Focus

---

[3]    Because the parties do not dispute the material facts, we cite to the CIT's recitation of the facts for ease of reference. *See Ford*, 254 F. Supp. 3d at 1302–14.

[4]    Like the Transit Connect 6/7s, the "Transit Connect 9s contain the number 9 in the sixth digit of the VIN." *Ford*, 254 F. Supp. 3d at 1304 n.13 (citations omitted). The Transit Connect 9s "are imported with a three-passenger second row seat." *Id.* (citation omitted).

platform, which means that" the two vehicle lines share
similar features, specifically, "[the Transit Connect] has
the same chassis and drivetrain as the Ford Focus passen-
ger vehicle." *Id.* (internal quotation marks, brackets, and
citations omitted). Ford designated its Transit Connects in
the United States as part of the V227N line, which includes
the Transit Connect Van (i.e., the Transit Connect 6/7) and
the Transit Connect Wagon (i.e., the Transit Connect 9).
*See id.* at 1307 & n.18. Ford displayed its Transit Connect
models at auto shows and advertised "in magazines and on
auto shopping websites." *Id.* at 1306 (internal quotation
marks and citations omitted). "Each Transit Connect was
built to order," with all available customization options
identified in an online brochure. *Id.* (internal quotation
marks and citations omitted).

At the time of importation, the subject merchandise
had several relevant characteristics. Ford specified the
subject merchandise's Gross Vehicle Weight Rating
("GVWR") as 5,005 pounds. *See id.* at 1307; *see also* 49
C.F.R. § 523.2 (2011) (explaining that GVWR refers to "the
value specified by the manufacturer as the loaded weight
of a single vehicle"). The Transit Connect 9, by contrast,
had a GVWR of 4,965 pounds. *See Ford*, 253 F. Supp. 3d
at 1307.[5] The Transit Connect 6/7s had a "four cylinder

---

[5]    Although the CIT recited that Transit Connect 9s
"are assigned a GVWR of 4[,]*695* pounds," *Ford*, 254 F.
Supp. 3d at 1307 (emphasis added) (citing J.A. 5945), this
was clearly a typographical error. The CIT cited to the par-
ties' joint statement of undisputed facts, which stipulated
that those vehicles "are assigned a GVWR of 4[,]*965*"
pounds. J.A. 5945 (emphasis added). Indeed, elsewhere,
the CIT acknowledged the correct number. *See Ford*, 254
F. Supp. 3d at 1326 (summarizing one of Ford's arguments
and acknowledging "the Transit Connect 9's 4[,]965 pound
GVWR").

gasoline engine, . . . a steel unibody construc-
tion[,] . . . front-wheel drive[,] rear passenger seats with
seat anchors[,] . . . underbody bracing[,] . . . front suspen-
sion[,] . . . and over [fifty] inches of space from floor to ceil-
ing in the rear." *Id.* (citations omitted). The subject
merchandise "had swing-out front doors with windows, sec-
ond-row sliding doors with windows," and "swing-out rear
doors, some of which had windows." *Id.* (internal quotation
marks and citations omitted). "[N]o Transit Connect 6/7s
had a panel or barrier between the first and second row of
seats." *Id.* (internal quotation marks and citation omitted).
When imported, the subject merchandise had "second row
seats; seat belts for every seating position; permanent brac-
ing in the side pillars of the car body," as well as "child-
locks in the sliding side doors; dome lighting in the front,
middle, and rear of the vehicle; a full length molded cloth
headliner; coat hooks in the second row; and a map pocket
attached to the front driver seat." *Id.* (citations omitted).
The vehicles also had "front vents and front speakers," cup
holders in the center and rear console, and "carpeted foot-
wells in front of the second row seat." *Id.* at 1307, 1308
(internal quotation marks and citation omitted). However,
the vehicles "did not have rear (behind the front seats)
vents, speakers, . . . handholds"; "side airbags in the area
behind the front seats"; or "a cargo mat." *Id.* at 1308 (cita-
tions omitted). "[T]he painted metal floor of the cargo area
was left exposed." *Id.* (citations omitted).

Central to the underlying dispute were the Transit
Connect 6/7s' second row seats. "[T]he second row
seats . . . did not include headrest[s], certain seatback
wires, a tumble lock mechanism, or accompanying labels,
and were wrapped in cost-reduced fabric." *Id.* (internal
quotation marks, brackets, and citations omitted). When
Ford began importing MY 2010 Transit Connect 6/7s (as
opposed to the MY 2012 versions at issue here), it used rear
seats similar to those that were eventually used in the MY
2012 Transit Connect 9s. *See id.* at 1308–09. To reduce

costs, Ford created, "[i]n mid-MY[ ]2010," its "first cost-re-
duced seat ('CRSV-1')," which "resulted in the removal of
the head restraints, torsion bar assembly and mount, tum-
ble lock mechanism and associated labels, and backrest re-
inforcement pad from the MY[ ]2010 Transit Connect 6/7
rear seat." *Id.* at 1310 (citations omitted). Ford subse-
quently created its second cost-reduced seat ("CRSV-2"),
which are the seats that were used in the subject merchan-
dise. *See id.* at 1311. These seats "incorporated the follow-
ing changes from CRSV-1": (1) "removal of four of the
seven seatback wires," (2) "wrapping of the seat in a cost-
reduced fire-resistant grey woven cover[,] . . . which is not
the same as the fabric used to cover the front seat," (3) "re-
placement of the front leg seat anchor cover, which was de-
signed to attach to the tumble lock mechanism, with a
cover that did not contain a space for the tumble lock mech-
anism," (4) "removal of the red indicator flags and housings
associated with the tumble lock mechanism to leave a bare
metal lever," (5) "removal of the small rubber pad from the
rear seat leg intended to decrease noise and vibration from
around the rear floor latches," (6) removal of "the fabric
mesh covering the rear seat bottom," and (7) discontinua-
tion of the application of the "black paint to the visible,
metal portions of the [rear] seat frame." *Id.* (internal quo-
tation marks, brackets, and citations omitted). Although
Ford's "engineers concluded that the fabric change and re-
moval of seatback wires did not affect the CRSV-2's
FMVSS compliance," "Ford did not conduct consumer test-
ing or surveys before implementing the CRSV-2." *Id.* (in-
ternal quotation marks and citations omitted).

After importation, Ford made several changes to the
subject merchandise once the merchandise cleared Cus-
toms, but while the imported merchandise "w[as] still
within the confines of the port." *Id.* at 1312. For instance,
all Transit Connects underwent processing, such as "re-
moving . . . a protective covering," "disengaging Transpor-
tation Mode," and "checking for low fuel." *Id.* (internal

quotation marks and citations omitted). The Transit Connect 6/7s underwent "additional" processing ("post-importation processing"). *Id.* Specifically, "the second-row seat[s were] unbolted and removed, along with the associated second row safety restraints. A steel panel was then bolted into the second row footwell to create a flat surface behind the first rows of seats." *Id.* (footnote and citations omitted). "A molded cargo mat was placed over the floor behind the first row," "[s]cuff plates were added inside the second-row doors," and "[i]n some vehicles the sliding door windows were replaced with a solid panel." *Id.* (citations omitted).

Therefore, "[a]ll Transit Connects are imported with second row seats, but the Transit Connect 6/7s are delivered to the customer as a two seat cargo van." *Id.* at 1307 (citations omitted). "The removed seats were recycled or otherwise disposed of." *Id.* at 1312 n.36 (citation omitted). Following this additional post-importation processing, the Transit Connect 6/7s maintained the following features: "underbody second-row seat support; anchors and fittings for the second-row seat[;] permanent bracing in the side pillars to support the removed safety restraints; and the beam and foam in the side sliding doors for rear passenger crash protection." *Id.* at 1312 (footnote and citations omitted). However, during the post-importation processing, "[t]he anchor holes for the second row seat are plugged and no longer readily accessible." *Id.* at 1312 n.38.

## II. Procedural History

In February 2012, "the Port of Baltimore notified Ford that [Customs] had initiated an investigation into Ford . . . importations." *Id.* at 1314 (internal quotation marks and citations omitted). Following the investigation, in January 2013, Customs found that the subject merchandise was properly classified under HTSUS Heading 8704, specifically HTSUS Subheading 8704.31.00. Customs Ruling HQ H220856 (Jan. 30, 2013), 2013 WL 1793233, at *11. Accordingly, Customs liquidated the subject merchandise

at the 25% duty rate associated with HTSUS Subheading 8704.31.00. *Ford*, 254 F. Supp. 3d at 1303. "Ford timely and properly protested" this decision. *Id.* Customs denied Ford's protest. *Id.*

Ford filed a complaint with the CIT, alleging Customs improperly denied its protest. J.A. 98. The CIT held that the subject merchandise should have been classified under HTSUS Subheading 8703.23.00. *Ford*, 254 F. Supp. 3d at 1333. The CIT evaluated the subject merchandise's condition at the time of importation, *see id.* at 1316–17, and concluded "the Transit Connect 6/7's structural and auxiliary design features point to a principal design for the transport of persons," *id.* at 1328. The CIT explained that "because [HTSUS H]eading 8703 is not controlled by use, and an assessment of intended use is not necessary to distinguish [HTSUS Heading] 8703 from 8704," it found "it unnecessary to consider principal or intended use, or the [relevant use] factors, to define the tariff terms." *Id.* at 1332. Furthermore, the CIT rejected the argument that Ford's post-importation processing constituted a disguise or artifice, determining instead that Ford's removal of the rear seats "after importation is immaterial" and that Ford engaged in legitimate tariff engineering. *Id.* at 1324 (footnote omitted).

DISCUSSION

I. Standard of Review and Legal Framework

We review the CIT's decision to grant summary judgment de novo, applying the same standard used by the CIT to assess Customs' classification. *See Otter Prods., LLC v. United States*, 834 F.3d 1369, 1374–75 (Fed. Cir. 2016). "Although we review the decision of the CIT de novo, we give great weight to the informed opinion of the CIT and it is nearly always the starting point of our analysis." *Schlumberger Tech. Corp. v. United States*, 845 F.3d 1158, 1162 (Fed. Cir. 2017) (internal quotation marks, alterations, and citation omitted). Pursuant to U.S. Court of

International Trade Rule 56(a), the CIT "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

"The classification of merchandise involves a two-step inquiry." *ADC Telecomms., Inc. v. United States*, 916 F.3d 1013, 1017 (Fed. Cir. 2019). First, we ascertain the meaning of the terms within the relevant tariff provision, which is a question of law, and, second, we determine whether the subject merchandise fits within those terms, which is a question of fact. *See Sigma-Tau HealthSci., Inc. v. United States*, 838 F.3d 1272, 1276 (Fed. Cir. 2016). "Where, as here, no genuine dispute exists as to the nature of the subject merchandise, the two-step inquiry collapses into a question of law we review de novo." *ADC*, 916 F.3d at 1017 (internal quotation marks and citation omitted).

The HTSUS governs the classification of merchandise imported into the United States. *See Wilton Indus., Inc. v. United States*, 741 F.3d 1263, 1266 (Fed. Cir. 2013). The HTSUS "shall be considered . . . statutory provisions of law for all purposes." 19 U.S.C. § 3004(c)(1) (2012); *see Chemtall, Inc. v. United States*, 878 F.3d 1012, 1026 (Fed. Cir. 2017) (explaining that "the tenth-digit statistical suffixes . . . are not statutory," as those suffixes are not incorporated in the HTSUS's legal text). "The HTSUS scheme is organized by headings, each of which has one or more subheadings; the headings set forth general categories of merchandise, and the subheadings provide a more particularized segregation of the goods within each category." *Wilton Indus.*, 741 F.3d at 1266. "The first four digits of an HTSUS provision constitute the heading, whereas the remaining digits reflect subheadings." *Schlumberger*, 845 F.3d at 1163 n.4. "[T]he headings and subheadings . . . are enumerated in chapters 1 through 99 of the HTSUS (each of which has its own section and chapter notes) . . . ." *R.T. Foods, Inc. v. United States*, 757 F.3d 1349, 1353 (Fed. Cir. 2014). The HTSUS "also contains the 'General Notes,' the

'General Rules of Interpretation' ('GRI'), the 'Additional
[U.S.] Rules of Interpretation' ('ARI'), and various appen-
dices for particular categories of goods." *Id.* (footnote omit-
ted).

The GRI and the ARI govern the classification of goods
within the HTSUS. *See Otter Prods.*, 834 F.3d at 1375.
"The GRI apply in numerical order, meaning that subse-
quent rules are inapplicable if a preceding rule provides
proper classification." *Schlumberger*, 845 F.3d at 1163.
GRI 1 provides, in relevant part, that "classification shall
be determined according to the terms of the *headings* and
any relative section or chapter notes." GRI 1 (emphasis
added). "Under GRI 1, [we] first construe[] the language of
the heading, and any section or chapter notes in question,
to determine whether the product at issue is classifiable
under the heading." *Schlumberger*, 845 F.3d at 1163 (in-
ternal quotation marks and citation omitted). "[T]he pos-
sible headings are to be evaluated without reference to
their subheadings, which cannot be used to expand the
scope of their respective headings." *R.T. Foods*, 757 F.3d
at 1353 (citations omitted). "Absent contrary legislative in-
tent, HTSUS terms are to be construed according to their
common and commercial meanings, which are presumed to
be the same." *Well Luck Co. v. United States*, 887 F.3d
1106, 1111 (Fed. Cir. 2018) (internal quotation marks and
citation omitted). "To discern the common meaning of a
tariff term, we may consult dictionaries, scientific authori-
ties, and other reliable information sources." *Kahrs Int'l,
Inc. v. United States*, 713 F.3d 640, 644 (Fed. Cir. 2013) (ci-
tation omitted). By contrast, the ARI contain, inter alia,
specific rules for interpreting use and textile provisions in
the HTSUS. *See* ARI 1(a)–(d); *Schlumberger*, 845 F.3d at
1163 n.5 (explaining that the ARI do not apply to *eo nomine*
provisions). ARI 1(a) provides that, when a tariff provision
is "controlled by use (other than actual use)," then classifi-
cation "is to be determined in accordance with the use in
the United States at, or immediately prior to, the date of

importation, of goods of that class or kind to which the imported goods belong, and the controlling use is the principal use." ARI 1(b) governs classification by "actual use," rather than principal use.

We may also consider the relevant Explanatory Notes ("EN"). *Fuji Am. Corp. v. United States*, 519 F.3d 1355, 1357 (Fed. Cir. 2008). "The [ENs] provide persuasive guidance and are generally indicative of the proper interpretation, though they do not constitute binding authority." *Chemtall*, 878 F.3d at 1019 (internal quotation marks and citation omitted).

Once we determine the appropriate heading, we apply GRI 6 to determine the appropriate subheading. *See Orlando Food Corp. v. United States*, 140 F.3d 1437, 1442 (Fed. Cir. 1998). GRI 6 provides that "the classification of goods in the subheadings of a heading shall be determined according to the terms of those subheadings and any related subheading notes and, *mutatis mutandis*, to the above [GRIs], on the understanding that only subheadings at the same level are comparable."

## II. The CIT Erred in Granting Summary Judgment for Ford and Denying Summary Judgment for the Government

### A. HTSUS Heading 8703 Is an *Eo Nomine* Provision that Inherently Suggests Use

HTSUS Heading 8703 covers "[m]otor cars and other motor vehicles principally designed for the transport of persons (other than those of [HTSUS H]eading 8702), including station wagons and racing cars." The CIT found that an examination of the vehicle's use was not "necessary or helpful to arriving at the correct classification." *Ford*, 254 F. Supp. 3d at 1331. The Government contends the CIT erred by classifying the subject merchandise under HTSUS Heading 8703, contrary to Customs' classification. *See* Appellant's Br. 17. The Government argues Customs

correctly determined that "the overwhelming majority of [the relevant design features] indicated that the [Transit] Connect 6/7 is not principally designed for the transport of persons." *Id.* at 19 (internal quotation marks omitted). According to the Government, it was proper for Customs to consider, inter alia, factors that are typically used to evaluate the imported product's use in the United States. *See id.* at 36. We agree, in part, with the Government, and hold the CIT erred by refusing to consider intended use as part of its analysis.

"We first must assess whether the subject [h]eading[] constitute[s an] *eo nomine* or use provision[] because different rules and analysis will apply depending upon the heading type." *Schlumberger*, 845 F.3d at 1164 (first citing *Kahrs*, 713 F.3d at 645–46 (defining *eo nomine* provision); then citing *Aromont USA, Inc. v. United States*, 671 F.3d 1310, 1312–16 (Fed. Cir. 2012) (defining principal use provision)). "[W]e consider a HTSUS heading or subheading an *eo nomine* provision when it describes an article by a specific name." *CamelBak Prods., LLC v. United States*, 649 F.3d 1361, 1364 (Fed. Cir. 2011) (citation omitted). "Absent limitation or contrary legislative intent, an *eo nomine* provision includes all forms of the named article, even improved forms." *Id.* at 1364–65 (internal quotation marks, brackets, and citation omitted). Generally, "a use limitation should not be read into an *eo nomine* provision." *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999). However, doing so may be appropriate where "the name itself inherently suggests a type of use." *Id.* Alternatively, "once tariff terms have been defined, . . . use of the subject articles [may] define[] an article[']s[] identity when determining whether it fits within the classification's scope." *GRK Can., Ltd. v. United States*, 761 F.3d 1354, 1359 (Fed. Cir. 2014).

Although HTSUS Heading 8703 is an *eo nomine* provision, the "principally designed for" portion inherently suggests a type of use, i.e., "the transport of persons." In

*Marubeni America Corp. v. United States* (*Marubeni II*), we considered the proper classification of Nissan's Pathfinder vehicle, examining the same two headings as the present appeal, and affirmed the CIT's conclusion that the subject merchandise was properly classified under HTSUS Heading 8703, as opposed to HTSUS Heading 8704. *See* 35 F.3d 530, 532 (Fed. Cir. 1994). In interpreting HTSUS Heading 8703, *Marubeni II* explained that the relevant dictionary definitions from *Webster's Third New International Dictionary of the English Language* (1986) define "'principally' as 'in the chief place, chiefly[]' and . . . 'designed' as 'done by design or purposefully opposed to accidental or inadvertent; intended, planned.'" *Id.* at 534. Given these definitions, HTSUS Heading 8703's purposeful language—that asks whether the merchandise is *chiefly intended* for the transportation of persons—inherently suggests intended use. *See id.*

We have held in other cases that an *eo nomine* provision may require looking to intended use. In *GRK*, we considered a tariff heading for "other wood screws" and explained that central to the "common understanding" of that heading is the "intended use of [the] screws" because the tariff provision is not directed to "screws made of wood," "but rather metal screws *used* to fasten wood." 761 F.3d at 1359. Similarly, in *Len-Ron Manufacturing Co. v. United States*, we considered a heading for "vanity cases" and agreed with the CIT that the heading covered "all forms of the articles," i.e., that the heading is *eo nomine*. 334 F.3d 1304, 1311 (Fed. Cir. 2003). Nevertheless, we explained that use was a relevant consideration because "for a handbag or case to be classified as a vanity case, containing, carrying, or organizing cosmetics must be its predominant use, rather than simply one possible use." *Id.* Therefore, we adopted the CIT's definition of vanity case as "a small handbag or case used to hold cosmetics" and explained that the at-issue "cosmetics bags are indisputably small handbags or cases *designed and intended to hold cosmetics*,"

such that they were classifiable as vanity cases. *Id.* at 1312 (emphasis added) (internal quotation marks omitted). As in those cases, use is relevant in construing "other motor vehicles principally designed for the transport of persons" in HTSUS Heading 8703 because this language suggests that classification is necessarily intertwined with whether an imported vehicle is chiefly intended to be used to transport persons. *Cf. Irwin Indus. Tool Co. v. United States*, 920 F.3d 1356, 1361 (Fed. Cir. 2019) (holding that "the terms pliers and wrenches" do not "inherently suggest . . . use," where "*the language of the particular headings . . .* do[] not imply that use or design is a defining characteristic" (emphasis added)).

This conclusion follows from our precedent in *Marubeni II*, which implicitly recognized that HTSUS Heading 8703 inherently requires looking to intended use. There, the court began its consideration of HTSUS Heading 8703 by conducting what appears to be an *eo nomine* analysis, without stating as much. *See Marubeni II*, 35 F.3d at 534–35 (construing the meaning of the heading under the GRIs without reference to the ARIs). We explained that "the statutory language" of HTSUS Heading 8703, which employs the word principally, "is clear that a vehicle's intended purpose of transporting persons must outweigh an intended purpose of transporting goods" and that "[t]o make this determination, . . . both the structural and auxiliary design features must be considered." *Id.* at 535. Then, *Marubeni II* proceeded by endorsing the consideration of use. *See id.* at 536. *Marubeni II* expressly *approved* of the CIT's reasoning below, which we acknowledged "carefully applied the proper standards" and evaluated not only the structural and auxiliary design features, but also "the marketing and engineering design goals (consumer demands, off the line parts availability, etc.)." *Id.*

For its part, the CIT's opinion discussed "marketing, as reflective of design intent and execution," under a heading titled "[m]arketing and use indicate the Pathfinder was

designed for transport of persons." *Marubeni Am. Corp. v. United States* (*Marubeni I*), 821 F. Supp. 1521, 1528 (Ct. Int'l Trade 1993). The CIT explained that the marketing evidence shows "that cargo capacity was not a major objective of the designer vis-à-vis the competition, at least as reflected in its polar charts. Product development documentation and advertising were consistent. The emphasis was on family use, loading groceries and sports equipment and 'go anywhere' élan." *Id.* (citation omitted). The CIT noted that, although "[t]he marketing and product planning documents mention cargo capacity[, it] does not appear to be a high priority." *Id.* at 1528 n.13. Given our endorsement of the CIT's consideration of marketing materials that speak to the *use* of the product, *see Marubeni II*, 35 F.3d at 536, we therefore have signaled that consideration of use is appropriate for HTSUS Heading 8703, *see id.*; *see also Aromont*, 671 F.3d at 1313 (listing appropriate considerations for use provisions, such as "use in the same manner as merchandise which defines the class" and "the manner in which the merchandise is advertised and displayed").

Ford's counterarguments are unavailing. First, Ford avers *Western States Import Co. v. United States* supports the conclusion that "intended use" is not relevant to the HTSUS Heading 8703 analysis. Appellee's Br. 62 (citing 154 F.3d 1380 (Fed. Cir. 1998)). In *Western States*, we affirmed the classification of merchandise under a subheading for bicycles other than bicycles "not designed for use with [wide] tires." 154 F.3d at 1381. The importer disagreed with this classification and argued Customs should have considered "the intent of the manufacturer," *id.* at 1382, as evidenced by the fact that "the bicycles were shipped with narrow tires," *id.* at 1383. We rejected this argument because it "changes the language of the statute, according primacy to the designer's state of mind and limiting the examination of the objective physical design features of a bicycle to a single facet of that design," i.e., "the

tire with which the bicycle is equipped." *Id. Western States* does not stand for the proposition that a manufacturer's design goals cannot be considered as one of many relevant considerations under the separate HTSUS Heading 8703. Indeed, *Marubeni II* specifically allows for consideration of "the *reasons behind* [certain] design decisions." 35 F.3d at 536. Moreover, although *Western States* recognized that HTSUS Heading 8703's principally designed language is "[t]he closest corollary" to the provision at issue there, the panel went to great lengths to distinguish the heading at issue from HTSUS Heading 8703. 154 F.3d at 1382; *see id.* ("The specific language at issue here requires [the importer] to establish affirmatively that its product is *not* designed for a specific use, rather than 'specially' or 'principally' designed for a specific purpose. The word 'not' . . . limits the tariff provision to bikes with design features that make them not suitable for or capable of use with wider tires. The use of the word 'not' does not contemplate a balancing of design features to determine what is principal, as in *Marubeni*[ *II*]."). The panel concluded that, "[e]ven if the bicycles at issue were designed with narrow tires in mind, or 'principally designed' with narrow tires in mind, they were not '*not designed* for use with' wider tires." *Id.* at 1383 (footnote omitted). Here, the principally designed language necessitates a broader inquiry, as described in *Marubeni II*, involving the "balancing of [structural and auxiliary] design features," *id.* at 1382, and the "reasons behind [those] design decisions," 35 F.3d at 536.

Second, Ford contends Customs improperly considered post-importation processing rather than limiting its evaluation to the subject merchandise's "condition as imported." Appellee's Br. 38. "The rule is well established that in order to produce uniformity in the imposition of duties, the dutiable classification of articles imported must be ascertained by an examination of the imported article itself, in the condition in which it is imported." *United States v.*

*Citroen*, 223 U.S. 407, 414–15 (1912) (internal quotation marks and citations omitted).  Our holding today does not controvert this rule, as this rule does not stand for the proposition that pre-importation activities can never be relevant.  Consideration of these factors flows from the plain meaning of the term "principally designed," which means chiefly "done by design or purposefully . . . ; *intended*[ or] *planned*."  *Marubeni II*, 35 F.3d at 534 (emphases added) (internal quotation marks and citation omitted).  Indeed, Ford apparently recognizes that its argument only precludes consideration of pre-importation design goals if we construe HTSUS Heading 8703 as not allowing for consideration of use.  Oral Arg. at 28:03–30, http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2018-1018_31320 19.mp3 (Q: "Is the condition at importation confined to just the physical characteristics or do you look to the structure of the sale and marketing and all of that . . . not on a post-importation look, but on a pre-importation look?" A: "I think that depends on what kind of heading this is. This is not a use provision.  This is an *eo nomine* provision . . . .").  Because the "principally designed for" language of HTSUS Heading 8703 inherently requires considerations of intended use, consideration of pre-importation design goals is relevant here.  Therefore, we consider pre-importation design goals below, along with the subject merchandise's condition as imported.

We conclude this appeal presents one of the very limited circumstances where the relevant heading, HTSUS Heading 8703, is an *eo nomine* provision for which consideration of use is appropriate because HTSUS Heading 8703 inherently suggests looking to intended use.  *See Kahrs*, 713 F.3d at 646 ("Generally, we should not read a use limitation into an *eo nomine* provision unless the name itself inherently suggests a type of use.").  The CIT erred by not considering use.  *See Ford*, 254 F. Supp. 3d at 1332 (finding "it unnecessary to consider principal or intended use, or the [attendant] factors").  Nevertheless, because the parties do

not allege that a "genuine dispute exists as to the nature of the subject merchandise, the two-step inquiry collapses into a question of law," and we proceed by conducting a proper analysis of the relevant headings. *ADC*, 916 F.3d at 1017 (internal quotation marks and citation omitted). *See generally* Appellant's Br.; Appellee's Br.

## B. The Subject Merchandise Does Not Fall Within HTSUS Heading 8703

In classifying the subject merchandise under HTSUS Heading 8703, the CIT held the subject merchandise's "structural and auxiliary design features point to a principal design for the transport of persons." *Ford*, 254 F. Supp. 3d at 1328. For structural design features, the CIT found support for this conclusion in "the Transit Connect 6/7's structural similarity to the Transit Connect 9 passenger wagon and its consistency with relevant parts of [the] [ENs]." *Id.* at 1326. For auxiliary design features, the CIT determined "the CRSV-2 is still a seat, albeit a cheaper and, perhaps, less attractive one," and the CIT pointed to "additional auxiliary design features," such as "carpeted footwells" and "child-locks in the sliding doors" to support its conclusion. *Id.* at 1328.

The Government argues that the CIT erred in classifying the subject merchandise under HTSUS Heading 8703 because "the structural and auxiliary design features of the [Transit] Connect 6/7—viewed as a whole—failed to demonstrate that the vehicle was 'principally designed' for passengers." Appellant's Br. 37. The Government also avers that "Ford marketed the [Transit] Connect 6/7 exclusively as a cargo van; consumers and industry publications recognized the [Transit] Connect 6/7 exclusively as a cargo van; purchasers used the [Transit] Connect 6/7 exclusively as a cargo van; and Ford itself described the [Transit] Connect 6/7 exclusively as a cargo van." *Id.* at 38–39. We agree with the Government that the CIT erred in classifying the subject merchandise under HTSUS Heading 8703.

The relevant inquiry for classification under HTSUS Heading 8703 is "that a vehicle's intended purpose of transporting persons must outweigh an intended purpose of transporting goods" and that, "[t]o make this determination, . . . both the structural and auxiliary design features must be considered." *Marubeni II*, 35 F.3d at 535. Structural design features include "basic body, chassis, . . . suspension design, [and] style and structure of the body control access to rear." *Id.* at 534 (brackets and ellipsis omitted). Auxiliary design features include "vehicle height," certain features of the "rear seats," "footwells," "seat belts," and other passenger amenities. *Id.* at 537. In addition, certain use considerations may be relevant, such as "the marketing and engineering design goals (consumer demands, off the line parts availability, etc.)." *Id.* at 536.

While not binding, the ENs help guide our understanding of the heading. *See Chemtall*, 878 F.3d at 1019. The ENs state that the heading covers "[f]our-wheeled motor vehicles with tube chassis, having a motor-car type steering system (e.g., a steering system based on the Ackerman principle)." EN(6), Heading 8703, HTSUS. The ENs identify "certain features which indicate that the vehicles are principally designed for the transport of persons rather than for the transport of goods," such as a GVWR "rating of less than [five] ton[s]," and "a single enclosed interior space comprising an area for the driver and passengers and another area that may be used for the transport of both persons and goods." EN, Heading 8703, HTSUS. The ENs also list certain features that "are indicative of the design characteristics" for HTSUS Heading 8703, such as the (1) "[p]resence of permanent seats with safety equipment (e.g., safety seat belts or anchor points and fittings for installing safety seat belts) for each person or the presence of permanent anchor points and fittings for installing seats and safety equipment in the rear area," (2) "[p]resence of rear windows along the two side panels," (3) "[p]resence of sliding, swing-out or lift-up door or doors, with windows, on

the side panels or in the rear," (4) "[a]bsence of a perma-nent panel or barrier between the area for the driver and front passengers and the rear area that may be used for the transport of both persons and goods," and (5) "[p]resence of comfort features and interior finish and fittings throughout the vehicle interior that are associated with the passenger areas of vehicles (e.g., floor carpeting, ventilation, interior lighting, ashtrays)."  EN, Heading 8703, HTSUS.

On balance, the structural design features, auxiliary design features, and inherent use considerations establish that the subject merchandise is not classifiable under HTSUS Heading 8703.  The subject merchandise is not principally designed for the transport of persons.  We dis-cuss each of these considerations in turn.

### 1. Structural Design Features

The structural design features favor a finding that the subject merchandise is designed for transport of passen-gers.  The Transit Connect 6/7s "shared the same chassis and drivetrain with the Ford Focus passenger vehicle." Def.'s Resps. to Pl.'s Statement of Material Facts ¶ 4, *Ford Motor Co. v. United States*, No. 1:13-cv-00291-MAB (Ct. Int'l Trade Mar. 4, 2016), ECF No. 91-13 (citations omit-ted).  Similarly, the imported Transit Connect 6/7s share the following structural features with Transit Connect 9s: "a Duratec 2.0[ liter], four cylinder gasoline engine"; "a steel unibody construction"; "front-wheel drive"; "Macpher-son strut front suspension"; "rear passenger seats with seat anchors"[6]; "underbody bracing"; "permanent bracing in the

---

6    Although the Transit Connect 6/7s have rear seats when imported, the discussion below regarding auxiliary design features demonstrates that the subject merchandise is not principally designed to use the rear area for the transport of persons.  *See infra* Section II.B.2.  That discus-sion, therefore, bears on our analysis of the structural

side pillars of the car body"; "no . . . panel or barrier be-
tween the first and second row of seats"; and "ground clear-
ance of 8.2 inches." J.A. 4845–50. While not dispositive,
*see Marubeni II*, 35 F.3d at 536 ("The fact that a vehicle is
derived in-part from a truck or from a sedan is not, without
more, determinative of its intended principal design objec-
tives which were passenger transport and off-road capabil-
ity."), these structural features demonstrate similarities
between the subject merchandise and Ford's Transit Con-
nect 9s, which are imported as five-passenger vehicles and
do not undergo post-importation processing to convert the
passenger vehicles into cargo vans, *see* J.A. 5948. Notably,
the evidence indicates that the Duratec "2.0 liter engine"
and front-wheel drive are "*more* commonly used on passen-
ger vehicles," a fact which indicates the significance of
these features for classification as a passenger vehicle.
J.A. 4846.

    In addition, all Transit Connects had "swing-out front
doors with windows, second-row sliding side doors with
windows" that met federal "safety standards for side im-
pact," and "swing-out rear doors, some of which had win-
dows." J.A. 4849. The ENs, which list "[p]resence of rear
windows along the two side panels" and "[p]resence of slid-
ing, swing-out or lift-up door or doors, with windows, on the
side panels or in the rear" as indicative of design charac-
teristics, demonstrate that these features of the subject
merchandise are consistent with a passenger vehicle. EN,
Heading 8703, HTSUS. However, a Ford brochure indi-
cates the rear doors are designed for cargo, describing the
"[r]ear [c]*argo* [d]oors" as capable of "be[ing] opened wide,
up to 180 degrees, for easy access to the expansive cargo
area to make loading easier" and stating the "[w]ide rear
opening makes rear access and loading or unloading easy."

———————————

design features to the extent it relates to the presence of
the rear seats.

J.A. 2825 (emphasis added); *see* J.A. 2826 (highlighting the "[r]ear cargo door opening width . . . [and] height" as "[k]ey [i]nterior [c]argo [d]imensions," along with "[c]argo length" and "[l]ow load floor height . . . [that] makes loading and unloading convenient"). Moreover, the two types of Transit Connects differed in that Ford assigned the Transit Connect 6/7s a *higher* "GVWR of 5[,]005 [pounds]," while the Transit Connect 9s "are assigned a GVWR of 4[,]965" pounds, indicating the subject merchandise is designed to bear more weight. J.A. 5945; *see* 49 C.F.R. § 523.2. This factor, however, does not weigh heavily against classification under HTSUS Heading 8703 because the ENs explain a GVWR "rating of less than [five] ton[s]," which describes both types of Transit Connects, "indicate[s] that the vehicles are principally designed for the transport of persons." EN, Heading 8703, HTSUS. Therefore, many of the structural design features favor the CIT's classification under HTSUS Heading 8703.

## 2. Auxiliary Design Features

A review of the auxiliary design features reveals the Transit Connect 6/7s were not principally designed for the transport of passengers. Admittedly, the subject merchandise has some features indicative of passenger vehicles, including "seat belts for every seating position," J.A. 4848; "child-lock in the sliding side doors," J.A. 4849; "footwells in front of a second row seat," J.A. 4850, "head room of more than [fifty] inches in the rear," J.A. 4851; "dome lighting in the front, middle, and rear of the vehicle," J.A. 4851; and "coat hooks in the second row," J.A. 4852; *see* EN, Heading 8703, HTSUS (identifying the presence of "comfort features," such as "interior lighting" as indicative of a passenger vehicle). However, the auxiliary design features of the rear seating area, when viewed in the aggregate, demonstrate the Transit Connect 6/7s were not principally designed for the transportation of passengers, with the CRSV-2 designed to be temporary and removed during post-importation processing.

Specifically, the Transit Connect 6/7's second row seats "did not have headrests, certain comfort wires, or a tumble lock mechanism." J.A. 4847; *see* J.A. 5936 (explaining that the "seat back wires provide[]", inter alia, "lumbar support" and "passenger comfort"). The second row seats were "covered in a reduced cost fabric" that was "different fabric [from] the" fabric used in the Transit Connect 9s. J.A. 4847. The Transit Connect 6/7s did not have (1) "a cargo mat," J.A. 5553 (citations omitted); (2) "side airbags behind the front seats," Pl.'s Resp. to Def.'s Statement of Material Facts ¶ 18, *Ford Motor Co. v. United States*, No. 1:13-cv-00291-MAB (Ct. Int'l Trade Mar. 7, 2016), ECF No. 99-5 (citation omitted); or (3) speakers, handholds, or vents behind the front seats, *id.* ¶¶ 19–21 (citations omitted); *see* EN, Heading 8703, HTSUS (identifying presence of "ventilation" as a "comfort feature[]" for passengers, but rear ventilation is lacking in the subject merchandise). Ford "left the painted metal floor of the cargo area exposed," which weighs against classification in HTSUS Heading 8703. J.A. 5553; *see* EN, Heading 8703, HTSUS (stating the presence of "interior finish[ings]" is indicative of a passenger vehicle). There is a fundamental reason behind these design decisions. *See Marubeni II*, 35 F.3d at 536 (endorsing the CIT's consideration of "the *reasons behind* [certain] design decisions," as a relevant consideration (emphasis added)). Ford employed the CRSV-2 to reduce costs, while facilitating post-importation processing of converting the Transit Connect 6/7s into cargo vans by using sham rear seats that would be stripped from the vehicles. *See* J.A. 5941–42 (explaining that the changes to the second row seats were a "cost reduction item," and "these seats will be scrapped in [the] U[nited] S[tates and] will not be used anytime").[7] In fact, the Transit Connects 6/7s had a

---

[7]    Because Ford made the subject merchandise to order, it knew that none of the CRSV-2s in the Transit Connect 6/7s would actually be used. *See* J.A. 4844

different sixth-digit in their VIN from the Transit Connect 9s to indicate which vehicles should undergo post-importation processing and removal of the rear seat. *See* J.A. 5540 ("Ford never sold any Transit Connect vehicles with a 6 or 7 in the sixth digit of the VIN with a second row of seats or seatbelts." (citation omitted)).

Even if the CIT is correct that the Transit Connect 6/7s' rear seat is *capable* of functioning as passenger seats in the condition as imported, *see Ford*, 254 F. Supp. 3d at 1327–28, the proper inquiry is what the auxiliary design features tell us about the "intended purpose" of the vehicle, *Marubeni II*, 35 F.3d at 535; *see* Heading 8703, HTSUS (including "motor vehicles *principally designed* for the transport of persons" (emphasis added)). Although the EN to HTSUS Heading 8703 recognizes that indicative of passenger vehicles is the "[p]resence of *permanent seats* with safety equipment . . . or the presence of *permanent anchor points* and fittings for installing seats and safety equipment in the rear area," the CRSV-2 is not permanent. The seat and the attendant seatbelts are designed to be removed.[8] Therefore, as Customs recognized, Ford's pre-importation design goals were that the subject merchandise could be

_____

(acknowledging that all Transit Connects are made to order), 5554 ("Prior to the merchandise at issue being ordered or manufactured, Ford had entered into a contract with its port processor to remove and discard 100 percent of the second row seats, seat belts and unordered windows from the merchandise at issue, and to cover the footwells and install a cargo mat over the exposed metal floor.").

[8]    The record demonstrates the subject merchandise "was stripped of its second row seats[ and] second row seat belts," J.A. 5554, and "[t]he anchor holes for the second row seat are" designed to be "plugged and no longer readily accessible after post-importation processing," J.A. 5948 (internal quotation marks and citation omitted).

constructed in such a way that "only minor interior changes were necessary to meet the design criteria of transporting cargo." HQ H220856, 2013 WL 1793233, at *5; *see id.* (stating it took "less than a minute" to remove the CRSV-2 and "under [five] minutes" to add "rear flooring to cover the exposed anchor points"). Indeed, "Ford did not [even] conduct consumer testing or surveys prior to using the [CRSV-2]." J.A. 5944.[9] The CIT erred in its evaluation of these auxiliary design features, which compel the conclusion that the subject merchandise is designed to transport cargo.

### 3. Relevant Use Considerations

The relevant use considerations strongly disfavor classification as a vehicle principally designed for the transport of passengers due to evidence of Ford's post-importation processing and its effect on the intended use of the Transit Connect 6/7s. While we conclude that HTSUS Heading 8703 is an *eo nomine* provision, not a principal use provision, the criteria for determining principal use are also relevant here. When evaluating principal use, a court makes "a determination as to the group of goods that are commercially fungible with the imported goods." *BenQ Am. Corp. v. United States*, 646 F.3d 1371, 1380 (Fed. Cir. 2011) (internal quotation marks and citation omitted). To make this determination, a court may look to the factors outlined in *United States v. Carborundum Co.* ("the *Carborundum* factors"). *Id.*; *see Carborundum*, 536 F.2d 373, 377 (CCPA 1976). Particularly relevant here are the following *Carborundum* factors: "the general physical characteristics of the merchandise," "use in the same manner as merchandise

---

9    Ford "considered affixing the windows to the sliding glass doors of certain Transit Connect vehicles with tape to increase *the ease of removal* by the port processers," but ultimately did not adopt this feature. J.A. 5553 (emphasis added) (citation omitted).

which defines the class," "the expectation of the ultimate purchasers," and "the environment of the sale, such as accompanying accessories and the manner in which the merchandise is advertised and displayed." *Aromont*, 671 F.3d at 1313.[10] Regarding general physical characteristics, we explained above that, whereas the structural design features align with a passenger vehicle, the auxiliary design features support the conclusion that the subject merchandise is not designed for passengers. *See supra* Section II.B.1–2.

Regarding manner of use and consumer expectations, the subject merchandise was made to order and, because the post-importation processing occurred immediately after entry, it "was delivered to customers as two-seat cargo vans," without rear seats, seatbelts, unordered windows, and second row footwells. J.A. 5555; *see* J.A. 5548, 5554. Ford's market research showed that the "Transit Connect has little appeal as a personal use vehicle—its industrial design and austere interior are keys to rejection. Nevertheless, it continues to resonate as a viable commercial vehicle," to be used for, inter alia, "quick deliveries, pickups, and service calls." J.A. 4751. In *Carborundum*, our predecessor court recognized that imports may be "specially processed to provide the import with a utility *different* from the class," 536 F.2d at 377; *see Aromont*, 671 F.3d at 1313 ("[A]ctual use of the particular imported goods is evidence of the principal use of the merchandise involved."), which is the case here because the Transit Connect 6/7s undergo

---

10   The other *Carborundum* factors are: "the economic practicality of so using the import," "the channels of trade in which the merchandise moves," and "the recognition in the trade of this use." *Aromont*, 671 F.3d at 1313 (citation omitted). Having considered the record evidence as to these other factors, we find nothing that alters our conclusion as to the use analysis.

post-importation processing and are not utilized like passenger vehicles, *see* J.A. 5554–55; *see also* HQ H220856, 2013 WL 1793233, at *6 ("The Ford website . . . features the Transit Connect [6/7]s *in use as cargo/delivery vehicles* by businesses such as the Maid Group, Danny Armand's Market[,] and Boo Boo Busters . . . ." (emphasis added) (internal quotation marks omitted)).

Regarding advertising, Ford's brochures market the Transit Connect 6/7s as a cargo van, but list the Transit Connect 9s as passenger vehicles. *See* J.A. 2798 (listing the Transit Connect 6/7s (i.e., the Van model) next to the Transit Connect 9s (i.e., the Wagon model), and advertise that the Transit Connect 6/7s do not contain passenger space in the second row but have cargo capacity of "129.6" cubic feet "[b]ehind [the] first-row seat," whereas the Transit Connect 9s have "67.1" cubic feet of passenger space in the second row but no cargo space behind "[b]ehind [the] first-row seat"), 2816 (highlighting that all Transit Connects have "[s]erious payload and GVWR capacity"), 2818 (advertising only "driver and front passenger" seats in the Transit Connect 6/7s), 2820 (providing "optional equipment" and stating "premium carpeted floor mats" for "rear passenger area" are "not available" as an option for the Transit Connect 6/7s, but are "optional" in the Transit Connect 9s (capitalization modified)), 2824 (marketing that Transit Connect 6/7s "provide up to 129.6 cubic feet of maximum *cargo capacity*" (emphasis added)). The Transit Connect 6/7s' use weighs heavily against classification under HTSUS Heading 8703. Accordingly, the *Carborundum* factors support the conclusion that the subject merchandise is not classifiable under HTSUS Heading 8703.[11]

---

[11]    The Government avers that the CIT erred in classifying Ford's subject merchandise under HTSUS Heading 8703 because Ford's installation of the CRSV-2 seats constituted "a disguise or artifice."    Appellant's Br. 26

### C. The Subject Merchandise Is Properly Classified Under HTSUS Heading 8704

In evaluating the competing headings, the CIT held, "having found that the subject merchandise is classifiable under [HTSUS H]eading 8703, [it] need not determine whether the subject merchandise is also classifiable under [HTSUS H]eading 8704" because HTSUS Heading 8703 is more specific. *Ford*, 254 F. Supp. 3d at 1332 n.64; *see id.* at 1316. The CIT, however, recognized that, "if the Transit Connect 6/7 is not classifiable under [HTSUS H]eading 8703, it falls within [HTSUS H]eading 8704." *Id.* (footnote omitted). The Government argues that the Transit "Connect 6/7 should be classified as a cargo vehicle under [HTSUS] Heading 8704." Appellant's Br. 35 (capitalization modified). We agree with the Government.

We begin by determining whether HTSUS Heading 8704 is an "*eo nomine* or use provision[]." *Schlumberger*, 845 F.3d at 1164 (citations omitted). Principal use provisions are governed by ARI 1(a), and a principal use "analysis involves determining the use which exceeds any other *single* use of the merchandise in the United States." *R.T. Foods*, 757 F.3d at 1355 (internal quotation marks and citation omitted). HTSUS Heading 8704, which covers "[m]otor vehicles *for the transport of goods*," HTSUS Heading 8704 (emphasis added), is a principal use provision because the heading identifies the chief use of the covered merchandise as of a kind used to transport goods, *cf. Aromont*, 671 F.3d at 1312 (finding "preparations there*for*" is a

---

(internal quotation marks omitted). Because we conclude that the CIT erred in classifying the subject merchandise under HTSUS Heading 8703 by applying an improper legal analysis, we need not address the Government's alternative theory. *See NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1209 n.4 (Fed. Cir. 1995) (declining to address an alternative argument).

"principal use provision" because it identified preparations primarily used for soups and broths); *BenQ*, 646 F.3d at 1374 (recognizing that a principal use analysis governs, where a chapter note clarified that a heading covered "unit . . . of a kind solely or principally used in an automatic data processing system").

As discussed above, the balance of the *Carborundum* factors demonstrate that the made-to-order Transit Connect 6/7s are principally (if not exclusively) used for the transport of goods, rather than passengers. *See supra* Section II.B.3. The design features demonstrate the subject merchandise is "tailored to meet the specific needs of" consumers seeking to transport goods. *United States v. Border Brokerage Co.*, 706 F.2d 1579, 1582 (Fed. Cir. 1983). Thus, classification under HTSUS Heading 8704 is appropriate.

D. The Correct Subheading for the Subject Merchandise Is HTSUS Subheading 8704.31.00

Having determined that the subject merchandise is properly classified under HTSUS Heading 8704, we now turn to GRI 6, which governs classification at the subheading level. *See Orlando Food*, 140 F.3d at 1442. At the sixth-digit subheading level, the subject merchandise is not described by HTSUS Subheading 8704.10, which provides "[d]umpers designed for off-highway use," as there is no evidence that Transit Connect 6/7s are designed for transporting excavated materials. *See* EN, Heading 8704, HTSUS (explaining that dumpers are "sturdily built vehicles with a tipping or bottom opening body, designed for the transport of excavated or other materials"). HTSUS Heading 8704 is then divided into three categories: (1) HTSUS Subheadings 8704.21, 8704.22, and 8704.23, which cover "[o]ther [than dumpers designed for off-highway use], with compression-ignition internal combustion piston engine (diesel or semi-diesel)," (2) HTSUS Subheadings 8704.31 and 8704.32, which cover "[o]ther [than dumpers designed for off-highway use], with spark-ignition internal

combustion piston engine," and (3) HTSUS Subheading 8704.90, which covers "[o]ther." *See Rollerblade, Inc. v. United States*, 282 F.3d 1349, 1354 (Fed. Cir. 2002) (holding that, where merchandise is properly classified under a particular heading, but does not fall within a specific subheading, it is properly classified under the relevant heading's "basket" or "catch-all" provision). Because the subject merchandise has "a spark-ignition internal combustion reciprocating piston engine," J.A. 4845, it is covered by the internal combustion piston engine description that applies to both HTSUS Subheadings 8704.31 and 8704.32. HTSUS Subheading 8704.31 covers merchandise with a "[GVWR] not exceeding [five] metric tons," while HTSUS Subheading 8704.32 covers merchandise with a "[GVWR] exceeding [five] metric tons." The subject merchandise has a GVWR of 5,005 pounds, J.A. 5945, which is less than five metric tons, *see* J.A. 1308 (stating, in a Customs opinion, that a GVWR of 5,005 pounds "converts to 2.27 metric tons"). Therefore, the subject merchandise falls under HTSUS Subheading 8704.31, and, because there is only one eighth-digit level designation under this subheading, we hold the subject merchandise is properly classified under HTSUS Subheading 8704.31.00.

CONCLUSION

We have considered Ford's remaining arguments and find them unpersuasive.[12] Accordingly, the Judgment of

---

[12]   Inter alia, Ford argues in a footnote that "[t]he CIT did not reach Ford's alternative arguments that classification under [HTSUS Heading] 8704 is contrary to Customs' prior treatment and established and uniform practice. If this [c]ourt does not affirm, it should give the CIT an opportunity to address those arguments in the first instance." Appellee's Br. 72 n.8 (citing *Ford*, 254 F. Supp. 3d at 1333 n.65). "Arguments raised only in footnotes . . . are waived." *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1294

the U.S. Court of International Trade is

**REVERSED**

---

(Fed. Cir. 2012); *cf. Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1355 (Fed. Cir. 2018).  We decline to exercise our discretion to consider Ford's argument here, where it fails to cite any governing law or develop what facts demonstrate that Customs had an "established and uniform practice." Appellee's Br. 72 n.8; *see Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351, 1358 (Fed. Cir. 2012) (finding "a passing reference in a footnote" was insufficient to "preserve the issue for appeal").